# STATE OF CONNECTICUT *v.* ALSTON WILLIAMS
## (AC 21243)

Schaller, Flynn and Shea, Js.

Argued March 2—officially released August 14, 2001

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Mitchell S. Brody*, assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, and *Dawn Gallo*, deputy assistant state's attorney, for the appellee (state).

*Opinion*

SHEA, J. The defendant, Alston Williams, appeals from the judgment of conviction rendered by a panel of three judges of the Superior Court.[1] The panel found him guilty of murder in violation of General Statutes § 53a-54a[2] as charged in the first count of the information, arson murder in violation of General Statutes § 53a-54d[3] as charged in the second count and arson in

---

[1] The defendant withdrew his initial request for a jury trial and elected a trial by a three judge panel.

[2] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

[3] General Statutes § 53a-54d provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits arson and, in the course of such arson, causes the death of a person. Notwithstanding any other provision of the general statutes, any person convicted of murder under this section shall be punished by life imprisonment and shall not be eligible for parole."

the third degree in violation of General Statutes § 53a-113[4] as charged in the third count. On appeal, the defendant claims that (1) the court improperly denied his motion to suppress the several statements he made to or in the presence of the police, (2) the court's finding that he was competent to stand trial and that no further competency examinations were necessary violated due process and (3) his conviction for arson murder is not supported by the evidence because the victim's death did not occur in the course of the arson as required by § 53a-54d. We affirm the judgment of the trial court.

The panel, as the trier of fact, reasonably could have found the following facts. On December 22, 1996, at approximately 6:22 a.m., the Hartford police received a 911 call reporting that the apartment building at 61 Imlay Street in Hartford was on fire and that a person in the building was in need of immediate medical assistance. The telephone call was made by Jennifer Garrison, who lived in an apartment on the second floor directly beneath apartment 304, which was occupied by the defendant on the third floor. Garrison had heard furniture being moved in the defendant's third floor apartment. When the noise became louder and a woman started to yell and then to scream, Garrison called the police for emergency assistance.

Stephen Hanks, who lived next door to the defendant in apartment 303, also heard the noise of moving furniture and the screams of a woman, as well as her cries for help emanating from the defendant's apartment. Looking through the peephole of his apartment door, Hanks saw a woman in the hallway who was saying: "[H]e set me on fire, he set me on fire." Another witness, Yusef Delaine, who lived in apartment 302, saw a

---

[4] General Statutes § 53a-113 (a) provides: "A person is guilty of arson in the third degree when he recklessly causes destruction or damage to a building, as defined in section 53a-100, of his own or of another by intentionally starting a fire or causing an explosion."

woman knocking on doors as she ran through the hall-
way and heard her screaming: "[H]elp, he tried to set
me on fire, he tried to burn me." Garrison, accompanied
by a neighbor, left her apartment and walked up a rear
staircase to the third floor hallway, where she encoun-
tered Jearline Blakely, the victim, who was in pain
because the upper half of her body had been burned
pink. Blakely was screaming: "[H]e set me on fire, some-
body help me." She stopped screaming when Garrison
told her to go downstairs and await the assistance of
the emergency personnel who were in transit to the
apartment building.

At that time, smoke began to emerge from under the
door of the defendant's apartment, and Hanks observed
the defendant, wearing no clothing, exit from the apart-
ment into the hallway. He asked Hanks for some
clothes, and Hanks gave him a pair of pants. Thereafter,
Hanks went downstairs and learned that the victim was
with a neighbor in a first floor apartment.

Police officers arrived at the scene soon after receiv-
ing the 911 call. Sergeant Edmund Pawlina arrived
shortly after the first group of officers. Pawlina and
other officers entered a first floor apartment and were
directed to the kitchen, where they found Blakely, who
was naked from the waist up. She was wedged into a
small space between the sink and the stove. She was
badly burned on her face and on her upper torso. Pieces
of skin were hanging off her body and her flesh was
blistering in spots and oozing blood. She was shaking,
crying, groaning and screaming in pain.

Pawlina testified that Blakely named the defendant
as her assailant, and stated that she and the defendant
had been drinking in his apartment, that their relation-
ship was over and that he did not want her to leave.
An argument ensued and the defendant became angry.
He splashed some lighter fluid or kerosene on her from

a plastic bottle that he kept in the kitchen of his apartment. He lighted a match and flicked it at her, but it went out. Blakely pleaded with him not to light another, but he lighted a second match and threw it on her, igniting the lighter fluid or kerosene and setting her on fire. She told the officers that the defendant was somewhere in the building.

Pawlina and Officer Ronald DaMotta, accompanied by other officers, left the first floor apartment and went upstairs to the third floor of the building. When Pawlina reached the third floor landing, the defendant walked over to him and the other officers, and said, "I am the one you are looking for, I burned her, I did it, the fire is in my apartment, number 304." Pawlina testified that none of the officers had said anything to the defendant or had given him a *Miranda*[5] warning before he made those statements. Pawlina asked the defendant for his name, and the defendant responded, "Alston Williams." The defendant was handcuffed and then asked if he could get a shirt. Officer Bryant Moore escorted him down the stairs and out of the building into a police cruiser. Moore then read the standard *Miranda* warning to him. Thereafter, the defendant was taken to police headquarters.

The police officers attempted to extinguish the fire in the defendant's apartment, but were unable to do so. They ordered the evacuation of the residents inside the building. Blakely was taken to the emergency room at Saint Francis Hospital and Medical Center, where she was diagnosed as having life threatening second and third degree burns on her face, neck and upper body. During an interview, she told emergency room personnel that kerosene had been poured on her and that she had been set on fire. She was given morphine on four occasions for the pain resulting from her burns.

---

[5] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Thereafter, she was flown to the burn unit at Bridgeport Hospital, where she died after forty-one days of medical treatment. An autopsy revealed that Blakely's death was caused by complications from the thermal burns that covered 45 to 55 percent of her body.

At police headquarters, the defendant received another *Miranda* warning and was then questioned by Detective James Rovella. The defendant never asserted his right to remain silent. He told the police that he and Blakely had been drinking in his apartment when an argument ensued, the nature of which he refused to reveal. The defendant stated that Blakely picked up a bottle of lighter fluid that was in the apartment. The defendant pushed her, causing the kerosene to splash on her body. He said he did not know how the fire started. The defendant was calm and even tempered. Despite an odor of alcohol emanating from him, he did not appear to be intoxicated.

In the emergency room, DaMotta spoke to Blakely before hospital personnel began to attend to her. At trial, DaMotta testified that Blakely told him that she and the defendant had gone into his apartment, where they were drinking. When she decided that she wanted to leave, the defendant became angry because he did not want her to leave. They started to argue, and he picked up a plastic bottle of kerosene and started splashing it on her. He remained angry and started flicking lighted matches onto her, eventually igniting the kerosene.

Later in the day, at approximately 2:45 p.m., police investigators and a fire inspector from the Hartford fire department entered the defendant's apartment to determine the cause of the fire. They smelled a strong odor of kerosene or some other petroleum derivative. The heaviest fire damage was in the kitchen, which they concluded was the point of origin of the fire. They

also concluded that the fire had been started with a liquid accelerant and matches.

At trial, the defendant testified and gave a different account of the incident from that described in his unsolicited confession. He said that he and Blakely were friends and lovers. The defendant stated that Blakely knew that their relationship would end if his wife left Jamaica to join him in Hartford. He believed that Blakely also had relationships with two other men. On the day before the fire, he and Blakely had dinner together in his apartment. He testified that he had three or four drinks between 11 p.m. and 2 a.m., but that Blakely drank less. They went to bed about 2 a.m., and the defendant woke up between 5:30 and 6 a.m. Blakely was already out of bed. Both the defendant and Blakely resumed drinking that morning. When he went to the bedroom to get Blakely's Christmas present for her to take home, he felt something hit him on the back. It was a plastic container of lighter fluid that he kept in the kitchen. He picked it up and threw it back at Blakely in accordance with a game they sometimes played. He testified that she caught the container and there was a lighter in her hand and the fire went up. Blakely walked to the sink and turned the water on, which did not seem to help, so she walked past him and went out the front door of the apartment. She did not scream while she was inside the apartment. When the defendant saw the flames inside the apartment, he became frightened and walked out into the hallway without putting on any clothes. A neighbor threw him a pair of pants to wear. The defendant testified that he never saw Pawlina until he appeared in court.

Thereafter, the defendant was convicted on all three counts. Pursuant to *State* v. *Chicano*, 216 Conn. 699, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), the court merged the conviction for murder and arson murder and, on

June 25, 1999, imposed an effective sentence of life imprisonment without the possibility of parole. This appeal followed.

## I

The defendant first claims that the court improperly denied his motion to suppress several statements he made to or in the presence of the police. The challenged statements were made by the defendant (1) to Pawlina, and other officers, on the third floor landing outside the defendant's apartment, (2) to himself, which were overheard by Moore while the defendant was in the police cruiser, (3) to DaMotta while the defendant was in the police cruiser and (4) during Rovella's interrogation at the police station.

## A

The first statement that the defendant claims should have been suppressed by the court is his unsolicited outburst to Pawlina and Moore as they reached the third floor landing. Pawlina testified: "[U]pon going up the stairs, and upon reaching the third floor landing, I saw the defendant in the hallway, standing in the hallway. . . . Upon stepping onto the hallway myself from the stairs, the defendant saw me and the other officers, and immediately walked over to us. . . . The defendant simply walked over to us and stated that—something to the effect of, 'I'm the one you're looking for. I burned her. I did it. The fire is in my apartment.' " Pawlina further testified that neither he nor any other officer had said anything to the defendant before he made those statements.

The defendant contends that at the time he made the statements, he was distraught because of the incident and was standing naked in the hallway when the uniformed police officers, who had sidearms, converged on him from both the front and back staircases. On the

basis of those circumstances, the defendant claims that he was effectively in custody when he made the statements and, therefore, his confession violated *Miranda*. The defendant also claims, on the basis of those circumstances, that his admission was involuntarily made. We are unpersuaded.

In its memorandum of decision on the defendant's motion to suppress, the court found that the constitutional requirements of *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), did not attach because the defendant's confession preceded any police interrogation and because the defendant was not taken into custody before he made the incriminating statement to Pawlina. The court further found that the statement was voluntarily made. Accordingly, the court denied the defendant's motion to suppress that statement.

Before addressing the merits of the defendant's claims, we must first elucidate the proper standard of our review. In *State* v. *Pinder*, 250 Conn. 385, 411–13, 736 A.2d 857 (1999), "our Supreme Court clarified the proper scope of appellate review of a trial court's determination of custody." *State* v. *Corbin*, 61 Conn. App. 496, 503, 765 A.2d 14, cert. granted on other grounds, 256 Conn. 910, 911, 772 A.2d 1124, 1125 (2001). Our Supreme Court stated that "[i]n spite of our prior use of the 'substantial evidence' language . . . our approach long has been to conduct a plenary review of the record in order to make an independent determination of custody." *State* v. *Pinder*, supra, 412; *State* v. *Corbin*, supra, 503. With that standard of review in mind, we now turn to the defendant's claim.

There is little substance to the defendant's claim that his spontaneous confession violated his *Miranda* rights. The essence of the holding in *Miranda* is summarized in that opinion as follows: "[T]he prosecution may

not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda* v. *Arizona*, supra, 384 U.S. 444. Accordingly, "[f]or *Miranda* rights to attach, the following two requirements must be met: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. *Miranda* v. *Arizona*, [supra, 444]." (Internal quotation marks omitted.) *State* v. *Corbin*, supra, 61 Conn. App. 502; see *State* v. *Atkinson*, 235 Conn. 748, 757, 670 A.2d 276 (1996). "[A]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest." (Internal quotation marks omitted.) *State* v. *Corbin*, supra, 502–503.

In the present case, the statements made by the defendant when the police officers arrived at the third floor landing were not preceded by any questioning, let alone custodial interrogation. They appear to have been spontaneous, possibly actuated by remorse or the excitement of the occasion. Nothing in *Miranda* even

suggests that such statements should be suppressed.[6] Furthermore, the record lacks any evidence that would support the defendant's assertion that he was constructively in police custody at the time he made his confession. A reasonable person would not conclude that he was in police custody by the mere approach of police officers in the present case.

The court concluded, and we agree, that the defendant was not in custody and was not interrogated by police until after he confessed. Pawlina testified that prior to any interrogation and before the defendant was taken into custody, the defendant had spontaneously confessed that: "I'm the one your looking for. I burned her. I did it. The fire is in my apartment." Pawlina further testified that by the time they reached the third floor landing, "we knew we were looking for somebody that had started a fire. I—I didn't know it was the defendant at the time. But, since he had made those statements, we immediately took him into custody as a suspect." On the basis of Pawlina's testimony, we conclude that the police took the defendant into custody only after he confessed.

We note that the defendant, in his reply brief, claims that the panel should have concluded that the police did interrogate him on the basis of the testimony of Hanks, the defendant's next door neighbor. Hanks testified that he heard the officers ask the defendant some questions when they came to the third floor landing. Hanks could not recall what questions the officers asked the defendant. Pawlina testified that neither he

---

[6] We note that the defendant, in his brief, cites *Dickerson* v. *United States*, 530 U.S. 428, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000), which reaffirmed *Miranda* and states that its requirements must be made known to a suspect before any statement arising out of an in-custody interrogation is admissible against him. Nothing in *Dickerson* precludes the admission of statements made by a defendant prior to any interrogation and before he is taken into custody, as in the present case.

nor any other officer said anything to the defendant before he confessed. Pawlina also testified that he did ask the defendant for his name only after he had confessed.

On the basis of our review of the record as a whole, we conclude that the court properly found that the defendant was neither in custody nor was he being interrogated by the police when he confessed. Accordingly, we conclude that his *Miranda* rights had not yet attached, and the defendant cannot prevail on his claim.

The defendant also claims on appeal that his statement on the third floor landing was involuntarily made, and the court's refusal to suppress the statement deprived him of due process. "[T]he use of an involuntary confession in a criminal trial is a violation of due process. *Mincey* v. *Arizona*, 437 U.S. 385, 398, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978); *Miranda* v. *Arizona*, supra, [384 U.S. 461–63]; *State* v. *DeAngelis*, 200 Conn. 224, 232, 511 A.2d 310 (1986). The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence." (Internal quotation marks omitted.) *State* v. *Corbin*, supra, 61 Conn. App. 505; see *State* v. *Pinder*, supra, 250 Conn. 418.

Before addressing the merits of the defendant's claims, we must first outline the proper scope of appellate review of a trial court's determination of the voluntariness of a statement. "[T]he proper scope of review [of] the ultimate issue of voluntariness requires us, not to ascertain whether the trial court's finding is supported by substantial evidence, but to conduct a plenary review of the record in order to make an independent determination of voluntariness. . . . *State* v. *Pinder*, supra, 250 Conn. 420–21." (Internal quotation marks omitted.) *State* v. *Corbin*, supra, 61 Conn. App. 506.

Having that standard of review in mind, we now must determine whether the defendant's statement was voluntary.

"We make such a determination by examining the totality of the circumstances surrounding the confession, and determining whether the confession [was] the product of an essentially free and unconstrained choice by the maker. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . *State* v. *James*, 237 Conn. 390, 410–11, 678 A.2d 1338 (1996)." (Internal quotation marks omitted.) *State* v. *Corbin*, supra, 61 Conn. App. 506. With those principles in mind, we turn to the merits of the defendant's claims.

Applying those factors to the present case, we conclude that the facts overwhelmingly support the court's determination that the defendant's confession was voluntary. It is clear that the defendant's statement was not solicited by the police. Testimony at trial established that the defendant spontaneously confessed at the first sight of uniformed police officers. Furthermore, the defendant was not detained, and there is no evidence that the police coerced him into making the challenged statement. Accordingly, after conducting a plenary review of the entire record, we conclude that the court properly determined that the defendant's statement to police on the third floor landing was voluntarily made.

B

The defendant next claims that the court improperly denied his motion to suppress statements that were overheard by Moore while the defendant was sitting in the backseat of a police cruiser after police had given him a *Miranda* warning. Specifically, the defendant

claims that the statements were involuntarily made, and were not given after a knowing and intelligent waiver of his *Miranda* rights. We disagree.

After the defendant confessed to Pawlina on the third floor landing, he was placed in the back of Moore's police cruiser. Moore first gave the defendant the standard *Miranda* warning, which he read from a card. He then asked the defendant to state his name and date of birth. He asked no other questions of the defendant. The defendant, who was wearing only a pair of pants without a shirt or shoes, said he was cold. Moore told him that the heat in the cruiser was on, but asked no further questions. Moore testified, however, that, while they sat in the cruiser awaiting an additional officer, he heard the defendant talking to himself in a low voice. The defendant stated something to the effect, "I can't believe this is happening. What am I going to tell my family back in the island? . . . I can't believe, you know, I'm ruining my life like this." At no time, while the defendant was in Moore's cruiser, did he say that he wanted to remain silent or that he wanted an attorney, despite having been informed of his *Miranda* rights. Moore testified that the defendant was calm, coherent, spoke in a clear and low voice, and did not appear to be under the influence of alcohol.

Because the defendant was in custody and was properly advised of his *Miranda* rights, our resolution of his claim requires us to determine whether he made a valid waiver of his rights. "Pursuant to the fifth and fourteenth amendments to the United States constitution, a statement made by a defendant during custodial interrogation is admissible only upon proof that he . . . waived his rights [under *Miranda*] . . . . To be valid, a waiver must be voluntary, knowing and intelligent. . . . The state has the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights.

. . . Whether a purported waiver satisfies those requirements is a question of fact that depends on the circumstances of the particular case. . . . Although the issue is therefore ultimately factual, our usual deference to fact-finding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence. . . .

"Whether the defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . Factors which may be considered by the trial court in determining whether an individual had the capacity to understand the warnings include the defendant's experience with the police and familiarity with the warnings . . . his level of intelligence, including his IQ . . . his age . . . his level of education . . . his vocabulary and ability to read and write in the language in which the warnings were given . . . intoxication . . . his emotional state . . . and the existence of any mental disease, disorder or retardation. . . . Furthermore, [a] defendant's express written and oral waiver is strong proof that the waiver is valid." (Citation omitted; internal quotation marks omitted.) *State* v. *Lewis*, 60 Conn. App. 219, 244–45, 759 A.2d 518, cert. denied, 255 Conn. 906, 762 A.2d 911 (2000); *State* v. *Fernandez*, 52 Conn. App. 599, 610–11, 728 A.2d 1, cert. denied, 249 Conn. 913, 733 A.2d 229, cert. denied, 528 U.S. 939, 120 S. Ct. 348, 145 L. Ed. 2d 272 (1999).

The court concluded that the defendant's statements were voluntary and amounted to a knowing, voluntary and intelligent waiver of his *Miranda* rights. In its memorandum of decision denying the defendant's motion to suppress, the court stated that "the defendant's waiver in the cruiser was knowingly, voluntarily and

intelligently made; that the admissions, if inculpatory, were voluntarily and readily tendered by the defendant." The court found that the defendant was properly administered his *Miranda* warnings after being placed in the cruiser. Thereafter, the defendant was not questioned by police officers, but spoke voluntarily.

The record discloses no evidence of threats, promises, coercive or deceptive measures employed by the police officers in an attempt to elicit a confession from the defendant. Furthermore, the defendant was calm, coherent, spoke in a clear and low voice, and did not appear to be under the influence of alcohol when he made the challenged statement. Our scrupulous review of the record leads us to conclude, as did the court, that the defendant's statements were voluntarily made, and that he voluntarily, knowingly and intelligently waived his *Miranda* rights which, the police properly and timely administered to him.

## C

The third set of statements that the defendant claims the court should have suppressed are those he made to DaMotta from the police cruiser. The defendant claims that those statements were involuntarily made, and were not given after a knowing and intelligent waiver of his *Miranda* rights. We disagree.

Approximately ten to twenty minutes after being placed in the backseat of the cruiser, the defendant had a three to ten minute conversation with DaMotta, who stood near the open rear door of the cruiser. Moore remained in the driver's seat of the cruiser behind a Plexiglas barrier. The defendant smelled of alcohol, but did not appear to DaMotta to be intoxicated. DaMotta asked the defendant if he understood his rights, and the defendant replied that he did. DaMotta again read the *Miranda* warnings to the defendant. The defendant said he understood those warnings, but he did not

request an attorney. In response to DaMotta's questions, he stated that he and the victim had been drinking, that they argued, that the victim picked up a bottle of kerosene, that he pushed the victim, causing her to splash kerosene on herself, that he passed out and that he could not remember how the fire had started. DaMotta repeatedly asked the defendant how the fire started, but the defendant repeatedly insisted that he did not know. DaMotta concluded that he could elicit no additional pertinent information from the defendant, and the conversation ended.

The court found that the defendant's statements to DaMotta were voluntarily offered. The court further concluded that the defendant properly waived his *Miranda* rights. Our review of the record as whole indicates that the defendant's statements were voluntarily made. The record contains no evidence of threats, promises or coercive or deceptive measures used by the police. Furthermore, after being read his *Miranda* warnings for the second time, the defendant consistently told DaMotta that he understood his rights. The record includes no evidence that the defendant did not understand the rights being read to him or that the waiver thereof was the product of police coercion or intoxication, mental defect, unstable emotional state or a deficient educational background. Accordingly, we conclude that, after receiving his *Miranda* warning for the second time, the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights.

### D

The fourth set of statements that the defendant claims should have been suppressed by the court are those he made to Rovella at the police station. The defendant claims that those statements were involuntarily made, and were not given after a knowing and intelligent waiver of his *Miranda* rights. We disagree.

The defendant was taken to police headquarters, where he eventually was escorted into a heated interview room by a uniformed officer. The doors of the room were locked. The defendant's handcuffs were removed, and he was given a cup of coffee. The defendant testified that after drinking the coffee, he started walking uncontrollably in circles. He declined an offer of food. About one-half hour after the defendant entered the interview room, Rovella entered and told him that he was under arrest. Rovella then described the charges against the defendant. At approximately 10 a.m., Rovella again read the *Miranda* warnings to the defendant from a standard police form. The defendant said he understood each right after it had been read to him. After the waiver section of the form had been read to the defendant, he signed and dated it. When questioned by Rovella, the defendant said he wanted to speak to the police without his attorney being present. The defendant then described his relationship with the victim, his jealousy and his desire to end their relationship upon learning that she had a husband and another boyfriend. He spoke about eating and drinking with the victim in his apartment.

The court found, and after our review of the record as a whole we agree, that the statements to Rovella at the police station were voluntarily made. The record contains no evidence of threats, promises or coercive or deceptive measures by the police. We are therefore persuaded that the defendant voluntarily answered Rovella's questions during the interrogation at the police station.

The court also found, and we agree, that the defendant's waiver of his *Miranda* rights was voluntarily, knowingly and intelligently made. After again being advised of his *Miranda* rights, the defendant signed a standard waiver form. "[A] defendant's express written and oral waiver is strong proof that the waiver is valid."

(Internal quotation marks omitted.) *State* v. *Lewis*, supra, 60 Conn. App. 245; see *State* v. *Northrop*, 213 Conn. 405, 418, 568 A.2d 439 (1990). The record lacks any evidence that the defendant did not understand his rights or that his waiver was not voluntarily, knowingly or intelligently made. Accordingly, we are persuaded, as was the court, that the defendant understood the ramifications of signing the waiver form and that his express waiver was not the product of police coercion or intoxication, mental defect, unstable emotional state or deficient educational background. We conclude, therefore, that the defendant voluntarily, knowingly and intelligently waived his *Miranda* rights prior to answering Rovella's questions at the police station.

In summation, we conclude that the defendant's unsolicited confession to the officers when they reached the third floor staircase landing was voluntarily made and was not preceded by any custodial interrogation, and that none of the statements made by the defendant to the police after being advised several times of his *Miranda* rights should have been suppressed. The court's conclusions are legally and logically correct, and are supported by the facts set out in the record. Accordingly, we affirm the court's denial of the defendant's motion to suppress.

II

The defendant next claims that the court's rejection of a finding by Patrick K. Fox, a psychiatrist with the New Haven court clinic, that the defendant was incompetent to stand trial and the court's refusal to grant the defendant's subsequent requests for additional evaluations of his competency violated due process. We disagree.

The following additional facts are relevant to our resolution of the defendant's claim. On June 26, 1997, the defendant appeared in court for a competency eval-

uation at the request of counsel representing him at that time. The court diagnostic clinic previously had submitted a six page report, which both counsel and the court had reviewed. The clinic's conclusion was that the defendant was competent, that he understood the proceedings and that he was capable of cooperating with counsel. The defense counsel stated, on the basis on his conversation with the defendant that morning and his reading of the report, the defendant was competent at that time and counsel was prepared to waive a hearing on the report. The court stated that it had reviewed the report, and had found that the defendant was competent to stand trial in that he understood the charges against him and was able to assist in his defense. The court also granted counsel's request for additional time and continued the case until July 24, 1997.

On January 6, 1999, the defendant again appeared in court. Since the initial competency evaluation, another attorney from the public defender's office had been assigned to represent the defendant. The presiding judge of the three judge panel conducted a lengthy inquiry of the defendant to determine whether he understood the charges against him and could assist his new counsel in presenting a defense. The court explained that the first count of the information filed by the state charged the defendant with causing Blakely's death, the second count charged him with arson murder and the third count charged him with having committed arson in the third degree. The court also explained that the defendant could testify in his defense, but that he was not required to do so because he also had a right to remain silent and receive the benefit therefrom. The court also described the role of the courtroom personnel, the prosecutor, the clerk, the deputy sheriffs, the court stenographer and its own position as the judge. The court inquired whether the defendant ever had any

history of psychiatric care before the incident at issue and whether he had ever been under the influence of any prescriptions, medications or drugs in his lifetime. The court also inquired whether the defendant had ever been addicted to alcohol or drugs. The defendant responded negatively to all of those questions. At the conclusion of its colloquy with the defendant, the court stated: "I'm absolutely satisfied, on this date, which is January 6, 1999, as I observe [the defendant], as I listen to his answers, as I see his reaction to my questions and his responses, that he is totally competent. That he is cooperative. He's attentive. He's responsive. And that he can assist [the defense counsel] in the defense of—of this case. That he understands the charges fully."

Thereafter, on February 22, 1999, counsel for the defendant filed a motion for a competency evaluation pursuant to General Statutes § 54-56d. Attached to the motion was a letter bearing the same date from Ezra E. H. Griffith, a psychiatrist and professor of psychiatry at the Yale University School of Medicine. The letter was an interim report of his examination of the defendant pursuant to a request by the defense counsel for the purpose of determining the psychiatric status of the defendant on December 22, 1996, when the fire that caused the death of the victim occurred. Griffith had interviewed the defendant at the Hartford Correctional Center on January 10, 16 and 18, 1999, for approximately nine hours. The letter states that Griffith had formed the opinion that the defendant was suffering from a psychotic disorder that was characterized by the presence of delusions, paranoid thinking, illogical reasoning and bizarre associations. He recommended that the defendant undergo a neuropsychiatric evaluation that would include certain laboratory tests and brain imaging. The letter stated, however, that the defendant had refused such an evaluation, and that it was noteworthy that the depth and significance of the defendant's

psychiatric disorder was partially hidden by an external demeanor of respectful interaction. The letter cited several examples of the defendant's delusions, such as his belief that the police had put something in the cup of coffee they gave to him after he was arrested and was taken to the police station. Griffith also stated that his contacts with the defendant had raised questions in Griffith's mind about the defendant's capacity to assist counsel in his defense. Griffith stated further that he had been struck by the marked rigidity and suspiciousness that characterized the defendant's thinking, as well as the bizarre reasoning that the defendant had employed in the discussion of his case and in conceptualizing his strategic options. Griffith also stated that the defendant had substantive difficulty in differentiating between objective reality and what he imagined to be true.

The hearing on the defendant's motion took place on February 23, 1999. The court recalled that, at the January 6, 1999 hearing, it had found that the defendant fully understood the charges against him, could assist his attorney in the defense of his case and was totally competent to stand trial. The defense counsel informed the court that, since the January 6, 1999 hearing, she had observed the deterioration of the defendant's mental state, which greatly affected his ability to assist in his defense. She told the court that the defendant had refused to give her information that might support his claim that Blakely was not herself at the time of the incident that caused her death. He also had refused to consider a defense of mental disease. After some further questioning of the defendant by the court, the motion for a competency examination of the defendant pursuant to § 54-56d (c)[7] was granted.

---

[7] General Statutes § 54-56d (c) provides: "Request for examination. If at any time during a criminal proceeding it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency."

One month later, the defendant sent a letter to his attorney, the third to represent him in this matter, requesting that she no longer represent him in the pending criminal case against him. His attorney filed a copy of the letter with the court and also gave a copy to the prosecutor. The court treated the letter as a motion to remove his attorney from the case and held a hearing on the motion on March 18, 1999. The court construed the letter as an expression of the defendant's frustration over the strategy and tactics being pursued by his attorney, particularly with regard to the competency examinations she had arranged and her suggestions that he should pursue an insanity defense even though he claimed never to have had any previous mental problems and believed he was capable of assisting her in the defense of his case. The court concluded that there was no basis for removing the defendant's attorney from the case.

On April 1, 1999, the court held a hearing on a report of the court diagnostic clinic, to which the court had referred the defendant for a competency examination pursuant to § 54-56d (c) at the hearing on February 23, 1999. The report was dated March 22, 1999, and was written by Fox on behalf of the commissioner of mental health and addiction services. Fox had examined the defendant on March 5, 1999, at the Walker correctional institution for approximately two and one-half hours. The report states as a finding that, at the time of the evaluation, the defendant was not able to demonstrate a rational understanding of the proceedings against him and to assist in his defense.

When interviewed by Fox, the defendant denied any previous contact with mental health professionals or prior psychiatric difficulties. He denied any history of medical problems, seizures or head trauma. He said he was an occasional drinker. He denied a history of blackouts or withdrawal symptoms associated with a

cessation of alcohol use. He denied ever having received treatment for alcohol or drug abuse and denied having used illicit substances. He said he had no prior difficulties with the law and that, at the time of the incident, he was working as a cook at a restaurant chain.

Fox reported that the defendant's thought processes were circumstantial, overly detailed and at times digressive. He was unable to provide summarized information or to give conclusory statements without first describing in detail their antecedents. He denied experiencing auditory or visual hallucinations. He also denied having thoughts of harming himself or others, and denied any disturbance in sleep, energy, appetite or concentration. The defendant was alert and generally attentive. His attention and concentration when formally tested were intact. His short-term memory was generally intact when tested, and his long-term memory was reasonably intact. His intelligence and general fund of knowledge were assessed by Fox to be in the average range.

When asked to state the charges against him, the defendant replied: "Arson, assault and murder." He also demonstrated an understanding of the police allegations with respect to his case and the circumstances in which they were alleged to have occurred. He demonstrated an understanding of the seriousness of the charges, but stated that he was not concerned. He also was able to define correctly the roles of the various courtroom personnel. When asked to describe the role of the defense counsel, he replied: "To protect and defend the defendant against the allegations of the state. That's what it should be."

Fox testified at the hearing on his report in support of his opinion that the defendant was incompetent to stand trial because of his delusions about the police conspiring against him, fabricating the charges, bribing witnesses and placing some drug in the cup of coffee

they gave him at the police station after his arrest that caused him to walk in circles. Fox was questioned extensively by the defendant's attorney, the prosecutor and the court.

Fox conceded that the defendant was aware of the charges against him, but maintained that he was not competent to stand trial because his delusions about the police conspiracy against him rendered him unable to assist his attorney in defending him. He recommended that the defendant be sent to a mental hospital for sixty days to receive treatment to dispel his delusions and restore his competency. The court concluded, however, that the only problem between the defendant and his attorney was their disagreement over raising the defense of insanity, which his attorney had recommended. The court declared that the decision of whether that defense should be raised was ultimately that of the defendant. It held that the defendant had failed to sustain his burden of proving he was incompetent by a preponderance of the evidence.

On May 11, 1999, prior to the commencement of trial before the panel, the defense counsel made an oral motion for a new competency examination, arguing that the defendant suffered from a delusional disorder that made him unable to distinguish reality from fantasy, and prevented him from appropriately evaluating the evidence against him and making appropriate decisions in his case. Counsel presented another report from Griffith in which he concluded that the defendant was suffering from a psychotic disorder at the time the burning incident occurred. She also informed the court that she had discussed the report with the defendant and that he still refused to pursue an insanity defense. The court denied the motion for another competency examination, finding no basis for concluding that the defendant was not competent to assist his attorney in his defense

or that he was unable to understand the proceedings against him.

Before the defendant was sentenced, but following his conviction, his counsel once again filed a motion for a competency examination pursuant to § 54-56d (c). The court again denied the motion, stating that the panel had an opportunity to hear the defendant testify and that he was lucid, coherent, logical, prepared for court proceedings, helpful to his defense counsel, and had presented his version of the facts in a logical and coherent manner.

We begin our analysis by first noting the appropriate standard with which we review the defendant's claim. We review the court's determination of competency under an abuse of discretion standard. *State* v. *Johnson*, 253 Conn. 1, 27 n.26, 751 A.2d 298 (2000). "In determining whether the trial court [has] abused its discretion, this court must make every reasonable presumption in favor of [the correctness of] its action. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Hernandez*, 254 Conn. 659, 665–66, 759 A.2d 79 (2000).

The "conviction of an accused person who is not legally competent to stand trial violates the due process of law guaranteed by the state and federal constitutions. Conn. Const., art. I, § 8; U.S. Const., amend. XIV, § 1 . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, supra, 253 Conn. 20. "This constitutional mandate is codified in . . . § 54-56d (a), which provides that [a] defendant shall not be tried, convicted or sentenced while he is not competent. [A defendant is not competent if he is unable to understand the proceedings against him or to assist in his own

defense.]" (Internal quotation marks omitted.) *State* v. *Garcia*, 233 Conn. 44, 67, 658 A.2d 947 (1995). "This statutory definition mirrors the federal competency standard enunciated in *Dusky* v. *United States*, 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960) (per curiam). According to *Dusky*, the test for competency must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him. . . . Id. . . . . Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Johnson*, supra, 20–21.

Section 54-56d (b) provides: "A defendant is presumed to be competent. The burden of proving that the defendant is not competent by a preponderance of the evidence and the burden of going forward with the evidence are on the party raising the issue. The burden of going forward with the evidence shall be on the state if the court raises the issue. The court may call its own witnesses and conduct its own inquiry." "Although § 54-56d (b) presumes the competency of defendants, when a reasonable doubt concerning the defendant's competency is raised, the trial court must order a competency examination. . . . Thus, [a]s a matter of due process, the trial court is required to conduct an independent inquiry into the defendant's competence whenever he makes specific factual allegations that, if true, would constitute substantial evidence of mental impairment. . . . Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports

or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency. . . . The trial court should carefully weigh the need for a hearing in each case, but this is not to say that a hearing should be available on demand. The decision whether to grant a hearing requires the exercise of sound judicial discretion." (Citations omitted; internal quotation marks omitted.) Id., 21–22.

A court may undertake a competency examination upon a motion by the defendant or the state and in some circumstances must evaluate the defendant's competency sua sponte. General Statutes § 54-56d (c). "If the court finds that the request for an examination is justified and that . . . there is probable cause to believe that the defendant has committed the crime for which he is charged, the court shall order an examination of the defendant as to his competency. . . ." General Statutes § 54-56d (d). "[A] trial court must order a competency hearing at any time that facts arise to raise a reasonable doubt about the defendant's competency to continue with the trial." (Internal quotation marks omitted.) *State* v. *Johnson*, supra, 253 Conn. 23.

Although the defense counsel's persistence in moving at every opportunity for a competency examination of the defendant may be commendable, the preponderance of the evidence does not suggest that the defendant's mental condition had deteriorated since December 22, 1996, when the fire in his apartment occurred. The record lacks any credible evidence that could raise a reasonable doubt about the defendant's competency throughout the course of the proceedings. His refusal to raise the defense of insanity, as recommended by his counsel, is not an indication of incompetency, but rather a disagreement over trial strategy. The court had informed the defendant that if he were found not guilty because he was suffering from a mental dis-

ease or defect, he would be committed to the custody of the commissioner of mental health. He may not have preferred that alternative to confinement in prison.

The defendant's delusionary thoughts, referred to by the psychiatrists who examined him, such as his claim that the police put some drug in the cup of coffee he was given at the police station and his belief that the occupants of his apartment building as well as the police were conspiring against him, may well have been his way of coping with the dire situation confronting him. As for his ability to assist his counsel, it was the defendant who concocted the defense presented at trial that, when he threw the plastic bottle of lighter fluid at the victim after she had thrown it at him, she had a lighter in her hand and the fire went up. If the three judge panel had believed the defendant's account of the incident, they might well have concluded that the victim's death was accidental.

We therefore conclude that the court did not abuse its discretion in denying the defendant's numerous motions for competency examinations after the court had rejected the conclusion of Fox that the defendant was incompetent to stand trial. We also affirm the court's conclusion that the defendant was competent to stand trial in April, 1999.

### III

The defendant claims that there was insufficient evidence to support his conviction of arson murder in violation of § 53a-54d. We disagree.

Before reaching the merits of the defendant's claim, we must first determine if it is properly before this court. The defendant concedes that this issue was not raised at trial, but claims the benefit of Practice Book

§ 60-5[8] and *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), which allows a reviewing court to entertain claims of constitutional error not properly raised at trial. Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id. "The first two questions relate to whether a defendant's claim is reviewable, and the last two relate to the substance of the actual review." (Internal quotation marks omitted.) *State* v. *Payne*, 63 Conn. App. 583, 587, 777 A.2d 731 (2001).

The record is adequate to review the defendant's claim and the claim is of constitutional magnitude, alleging the violation of a fundamental right. Accordingly, we conclude that the issue is properly before us despite the defendant's failure to raise it in the trial court. See *State* v. *Roy*, 233 Conn. 211, 212–13, 658 A.2d 566 (1995). We now turn to the merits of the defendant's claim.

The defendant contends that the requirement of § 53a-54d, which is that the offender caused the death of the victim in the course of committing arson, was not proved by the evidence. Section 53a-54d provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits arson and, in the course of such arson, causes the death of a person.

---

[8] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

Notwithstanding any other provision of the general statutes, any person convicted of murder under this section shall be punished by life imprisonment and shall not be eligible for parole."

The defendant claims that the evidence proves only that he committed the crime of murder and then, by his reckless conduct, committed the crime of arson in the third degree. The defendant, however, disregards Pawlina's testimony that Blakely told him and other officers that the defendant became angry and splashed some lighter fluid or kerosene on her after she told him that their relationship was over and that she wanted to leave. Thereafter, the defendant lighted a match and flicked it at her. The match went out. Blakely pleaded with him not to light another, but he lit a second match and threw it on her, igniting the lighter fluid or kerosene and setting her on fire. According to that testimony, it appears that the defendant's act of throwing a lighted match at Blakely when her skin and her clothing were saturated with kerosene or lighter fluid was the cause of her death and the ensuing fire within the apartment. There was no evidence of any other act of the defendant related to either Blakely's death or the fire. When questioned by the police as to how the fire occurred, the defendant said repeatedly that he did not know. At trial he testified that, after he was struck in the back with the plastic bottle of lighter fluid that Blakely had thrown at him, he threw it back at her. She caught it, and there was a lighter in her hand and the fire ignited. Even under the defendant's version of how the fire occurred, the same act that caused the victim's death also caused the fire within the apartment.

"The phrase 'in the course of' focuses on the temporal relationship between the murder and the underlying felony." *State* v. *Gomez*, 225 Conn. 347, 352, 622 A.2d 1014 (1993). Our Supreme Court has previously "addressed the meaning of the phrase 'in the course of'

as an element of robbery, under General Statutes § 53a-133." Id. "[I]f the use of force occurs during the continuous sequence of events surrounding the taking or attempted taking, even though some time immediately before or after, it is considered to be 'in the course of' the robbery or the attempted robbery within the meaning of the statute." *State* v. *Ghere*, 201 Conn. 289, 297, 513 A.2d 1226 (1986). As such, our Supreme Court has "defined the phrase 'in the course of' to include the period immediately before or after the actual commission of the crime . . . ." *State* v. *Gomez*, supra, 352.

We therefore conclude that the evidence presented at trial supports the court's conclusion that the defendant committed arson and, in the course of committing such arson, caused Blakely's death. Accordingly, because the alleged constitutional violation does not clearly exist and the defendant was not deprived of a fair trial, he cannot prevail on his claim.

The judgment is affirmed.

In this opinion the other judges concurred.