## IN RE CLARK K. ET AL.*
### (AC 21702)

Foti, Dranginis and Hennessy, Js.

---

credibility of witnesses.' "), cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001).

* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued February 13—officially released July 2, 2002

*Jeffrey W. Minnier*, for the appellant (respondent mother).

*Maureen D. Regula*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Susan T. Pearlman*, assistant attorney general, for the appellee (petitioner).

*Eric J. Palladino*, for the minor children.

*Opinion*

HENNESSY, J. The respondent mother of the minor children, C and M, appeals from the judgments of the trial court terminating her parental rights with respect

to both children.[1] The respondent claims that the court
improperly (1) admitted into evidence her alleged con-
fession that she made in a criminal case against her
stemming from injuries suffered by M, (2) proceeded
with the termination of parental rights hearing during
a time when the criminal charges were pending against
her and when the court knew that she would assert her
fifth amendment privilege against self-incrimination,
thereby denying her a full hearing, and (3) deprived her
of due process by terminating her parental rights prior
to the resolution of the criminal case, which arose out
of the same incident that led to the termination of her
parental rights.[2] We affirm the judgments of the trial
court.

The following procedural history is relevant to the
respondent's appeal. The commissioner of the depart-
ment of children and families (commissioner) filed peti-
tions alleging, pursuant to General Statutes §§ 46b-129
(a) and 46b-120, that both children were neglected in
that they were denied proper care and attention, physi-
cally, educationally, emotionally and morally, and that
they had been abused and had sustained physical injur-
ies by other than accidental means. Accompanying the
petitions alleging neglect were coterminous petitions
requesting that the parental rights of both the children's
parents be terminated.[3] The petitions requesting the

[1] During the proceedings, the respondent father of the two children con-
sented to the termination of his parental rights, and the court terminated
his parental rights as part of its ruling. Because the respondent father has
not appealed from the judgments, we refer in this opinion to the respondent
mother as the respondent.

[2] Because issue three essentially restates issue two in general due process
terms, we will not address issue three separately. We do, however, review
the trial court's decision to determine whether its conclusions were in
accordance with the facts and the law.

[3] General Statutes § 17a-112 (*l*) provides in relevant part: "Any petition
brought by the Commissioner of Children and Families to the Superior
Court, pursuant to subsection (a) of section 46b-129, may be accompanied
by or . . . consolidated with a petition for termination of parental rights
filed in accordance with this section with respect to such child. . . ."

termination of parental rights were amended to allege that M "has been denied by reason of act or acts of commission or omission, including but not limited to . . . severe physical abuse or a pattern of abuse by the mother, [and] the care, guidance or control necessary for his physical, educational, moral or emotional well-being . . . ." As to C, the amended petition alleged that the respondent had committed an assault through a deliberate, nonaccidental act that resulted in serious bodily injury to M. After a contested hearing, the court terminated the respondent's parental rights. This appeal followed.

"The standard of review on appeal [from a termination of parental rights] is whether the challenged findings are clearly erroneous. *In re Luis C.*, [210 Conn. 157, 166, 554 A.2d 722 (1989)]; *In re Christina V.*, 38 Conn. App. 214, 223, 660 A.2d 863 (1995). The determinations reached by the trial court that the evidence is clear and convincing will be disturbed only if [any challenged] finding is not supported by the evidence and [is], in light of the evidence in the whole record, clearly erroneous. . . .

"On appeal, our function is to determine whether the trial court's conclusion was legally correct and factually supported. *In re Michael M.*, [29 Conn. App. 112, 121, 614 A.2d 832 (1992)]; *In re Megan M.*, 24 Conn. App. 338, 342, 588 A.2d 239 (1991) . . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached; *Pandolphe's Auto Parts, Inc.* v. *Manchester*, [181 Conn. 217, 222, 435 A.2d 24 (1980)]; nor do we retry the case

We note that subdivision (*l*) of § 17a-112 had been designated subdivision (e) before Public Acts 2000, No. 00-137, § 1, took effect on July 1, 2000. Although the wording of the subdivision was not changed by the redesignation, subdivision (e) is applicable to C and subdivision (*l*) is applicable to M because the court on November 20, 2000, granted the commissioner's motion, as to M only, to amend the coterminous petitions.

or pass upon the credibility of the witnesses. *In re Christine F.*, 6 Conn. App. 360, 366–67, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986). Rather, on review by this court every reasonable presumption is made in favor of the trial court's ruling." *In re John G.*, 56 Conn. App. 12, 16, 740 A.2d 496 (1999).

In a comprehensive memorandum of decision, the court found the following facts. The respondent, born on April 24, 1977, was married in January, 1997. She gave birth to C on July 18, 1997, and to M on June 10, 1998. Since the age of seventeen, the respondent has suffered from a seizure disorder and, on June 21, 1998, eleven days after M's birth, she suffered from a seizure during which she dropped M. M, who as a result of the fall struck the edge of a couch, was brought to Waterbury Hospital, had his wound closed and was released. The respondent was given a prescription for Dilantin, an anticonvulsant medication, and counseled to sit while holding the children. On September 11, 1998, M was taken by ambulance to Waterbury Hospital and was found to have suffered three fractures of the skull. A piece of bone had been sheared off the right side of the skull. There was a subdural hematoma caused by blood having collected on the left side of the brain, and there was significant soft tissue swelling in the area of the right and left parietal skull fractures. M also had meningitis and was anemic.

When coterminous petitions are filed, the court first must determine, by a fair preponderance of the evidence, whether the child has been neglected. If the court so finds, it then may consider, as a disposition of the matter, a request to terminate parental rights. That requires consideration of the accompanying termination petition and a hearing thereon. "The hearing on a petition to terminate parental rights consists of . . . two phases, adjudication and disposition. See Practice Book § [33-12]. In the adjudicatory phase, the trial court

determines whether one of the statutory grounds for termination of parental rights exists by clear and convincing evidence. If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interest of the child." *In re Tabitha P.*, 39 Conn. App. 353, 360, 664 A.2d 1168 (1995).

Before we examine whether the facts found by the court were clearly erroneous, we need to address the respondent's claims concerning the admission of an alleged confession and court rulings that allegedly resulted in an unfair hearing.

I

The court, in part, based its findings of neglect and abuse and its resultant disposition on the respondent's statements contained in a written confession made to the police. The police questioned the respondent in connection with the injuries suffered by M. The respondent signed a statement that described her interaction with M and included the following: "Because he was still crying that's when I put my hand against his forehead and slammed [M] back against the floor." The respondent, prior to the hearing on the coterminous petition to terminate her parental rights, filed a motion in limine, requesting the court to exclude from evidence her signed statement to the police. The court denied the motion.

The respondent argues on appeal that the statements made to the police were not voluntary and, therefore, not admissible. Specifically, the respondent's attorney claims[4] that the respondent's interview with the police

---

[4] The respondent did not testify at the hearing on the motion in limine. Because she had been arrested on September 11, 1998, and charged with assault in the first degree in violation of General Statutes § 53a-59 and risk of injury to a child in violation of General Statutes § 53-21 in connection with the injuries suffered by M, she chose to remain silent.

lasted much too long and, on the day of the interview, she may have been in such a state of confusion that she did not clearly understand the import of the statements that she was making. In her statement to the police, the respondent claimed that M had fallen out of his car seat and hit his head on the concrete driveway. She also stated that about two hours later while she was burping him, M lunged backward, hitting his head on a rocking horse. Additionally, she claimed that a short time later, while she was giving M a bottle, he again lunged backward and hit the rocking horse. At that point, M was not moving and his eyes were shut. The respondent went to a neighbor who called for an ambulance. The respondent subsequently told Captain Kathleen Wilson of the Waterbury police department that she had lied to other police officers about the events leading to M's injuries. She admitted that she had pushed M's head against the floor, "and his head slammed against the floor and made a noise as if I dropped a phone book."

The respondent's attorney argued to the trial court that the respondent was at the police station on September 11, 1998, for approximately six hours, as a result of which she may have believed that she was not allowed to leave. He contended that it is a matter of speculation as to her state of mind. It is questionable, he claimed, whether she believed that she had to say anything to get out of the police station. He further argued that those circumstances "[touched] upon the reliability and trustworthiness of the alleged confession."[5]

---

[5] The respondent also argues that the statement that she provided to Wilson was not disclosed and that it had been the subject of a prior written discovery request. The statement was introduced at the hearing on the motion in limine. The respondent, in arguing to the court that the confession to Wilson dated September 11, 1998, should not be admitted into evidence, stated: "There is a signed confession that I obtained through discovery of the [commissioner's] file. The date is September 11, 1998." The evidence convinces this court that the respondent's written confession was in the possession of her attorney in time to advise her of its significance.

The court addressed the claim that the respondent's written statement to the police was involuntary by reviewing the testimony of the police officers and the argument of the attorneys. The court found that the respondent was twenty-one years of age, intelligent and able to read, that she had been advised of her constitutional rights and had initialed the waiver of rights form. The court then concluded that the respondent's signed statement was voluntary.

"Before addressing the merits of the defendant's claims, we must first outline the proper scope of appellate review of a trial court's determination of the voluntariness of a statement. [T]he proper scope of review [of] the ultimate issue of voluntariness requires us, not to ascertain whether the trial court's finding is supported by substantial evidence, but to conduct a plenary review of the record in order to make an independent determination of voluntariness. . . . We make such a determination by examining the totality of the circumstances surrounding the [statement], and determining whether the [statement was] the product of an essentially free and unconstrained choice by the maker. . . . Factors that may be taken into account, upon a proper factual showing, include: the youth of the [individual]; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep. . . . With those principles in mind, we turn to the merits of the defendant's claims." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 65 Conn. App. 59, 70–71, 782 A.2d 149, cert. denied, 258 Conn. 923, 782 A.2d 1251 (2001).

Applying those factors to the present case, we conclude that the facts overwhelmingly support the court's determination that the respondent's written statement

was voluntary. The respondent changed her story about how the injuries to M had occurred and, as a result, the length of time that the police spent questioning her was not inordinately long. She was not handcuffed or otherwise restrained, she was offered food and drink, she was questioned during the afternoon in an open room with windows where other people were working, and there were no claims that she was threatened or coerced. Accordingly, after conducting a plenary review of the entire record, we conclude that the court properly determined that the respondent voluntarily provided her written statement to the police on September 11, 1998.

II

The respondent further argues that the termination of parental rights hearing should not have proceeded while criminal charges were pending against her pertaining to the same incident involving M. Specifically, the respondent claims that her exercise of the right to remain silent, as guaranteed by the fifth amendment to the United States constitution, prevented her from fully explaining her actions in connection with the termination hearing. We disagree.

"The fifth amendment privilege against self incrimination 'not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.' *Lefkowitz* v. *Turley*, 414 U.S. 70, 77, 94 S. Ct. 316, 38 L. Ed. 2d 274 (1973)." *Olin Corp.* v. *Castells*, 180 Conn. 49, 53, 428 A.2d 319 (1980).

That protection or privilege against self-incrimination has also been inscribed into our rules of practice. Practice Book § 34-1 (f) provides in relevant part: "No parent

who is the subject of a petition shall be compelled to testify if the testimony might tend to incriminate in any criminal proceeding or to establish the validity of the facts alleged in the petition." As the trial court stated in its memorandum of decision, however: "The privilege against self-incrimination . . . is not a muzzle but a privilege." The exercise of the privilege can be waived, but in doing so, one is obligated to answer the questions asked, which can be used against one not only in the civil proceedings at hand but also at criminal proceedings in the future.

The respondent chose to remain silent at the hearing on the motion in limine and the termination of parental rights hearing. She cannot now complain that there was not a full and fair hearing based on the premise that she, herself, did not tell her side of the story.

### III

We now turn to a review of the court's decision to determine if the court's conclusions were in accordance with the facts and the law.

The commissioner filed a petition alleging that M had been neglected. General Statutes (Rev. to 1999) § 46b-120 provides in relevant part: "(8) a child . . . may be found 'neglected' who . . . (B) is being denied proper care and attention, physically . . . or (C) is being permitted to live under conditions, circumstances or associations injurious to his well-being, or (D) has been abused . . . ." " '[A]bused' means that a child or youth (A) has had physical injury or injuries inflicted upon him other than by accidental means, or (B) has injuries which are at variance with the history given of them . . . ."[6]

---

[6] Amendments to General Statutes § 46b-120 effective July 1, 2001, renumbered subdivision (8) as subdivision (9).

The court found, and the evidence supported such a finding, that M had been admitted to Waterbury Hospital, having sustained three skull fractures and a subdural hematoma. That diagnosis was made by Betty Spivack, a board certified pediatrician who had a fellowship in child abuse and neglect at Hasbro Children's Hospital in Rhode Island. Spivack testified during the hearing that the left parietal skull fracture was very recent and could not have resulted from M's having been dropped from a sitting position. She further testified that it required the application of force such as could be exerted by a person of adolescence or older. The respondent admitted in her written statement to the police that she had placed her hand on M's head and pushed it against the floor. The court reasonably could have found by a fair preponderance of the evidence that M had sustained physical injuries by other than accidental means.[7] The evidence and the law support the conclusion that M was abused and neglected.

The court, having found M to be a neglected child, then was required to determine a proper disposition. The commissioner requested that the disposition be the termination of the respondent's parental rights as to M. To accomplish that, the commissioner had filed a petition, alleging, in accordance with General Statutes § 17a-112 (j) (3) (C), that M "has been denied, by reason of an act or acts of parental commission or omission,

[7] There was testimony from Eric Hyson, a radiologist from Waterbury Hospital, who was uncertain if X rays revealed infant markings (sutures) rather than fractures. There also was testimony from James Merikangas, a specialist in neurology and psychiatry, retained by the respondent, who opined that M most likely suffered injuries to his head and bleeding inside his skull by being dropped by the respondent during an epileptic seizure. The court found that the respondent's own statement as to her assault on M and the skull fractures M suffered were more consistent with the testimony put forth by Spivack than with the testimony of Merikangas. "[I]t is in the sole province of the trier of fact to evaluate expert testimony, to assess its credibility, and to assign it a proper weight." (Internal quotation marks omitted.) *State* v. *Alterisi*, 47 Conn. App. 199, 204, 702 A.2d 651 (1997).

including but not limited to . . . severe physical abuse or a pattern of abuse . . . the care, guidance or control necessary for [his] physical, educational, moral or emotional well-being." Section 17a-112 (j) (3) (C) provides in relevant part: "Nonaccidental or inadequately explained serious physical injury to a child shall constitute prima facie evidence of acts of parental commission or omission sufficient for the termination of parental rights . . . ."

The court found, and the evidence is clear and convincing, that "the respondent deliberately and 'nonaccidentally' slammed [M's] head against the floor on September 11, 1998." The resulting fracture of the skull, as testified about by Spivack, caused impaired functioning of the brain, seizures and the potential for permanent brain injury or death.

The respondent's statement to the police that she placed her hand on M's head and pushed it against the floor, coupled with the medical testimony about the injuries to M as a result of the respondent's deliberate actions, presented the court with clear and convincing evidence that the statutory criteria required in the adjudicatory phase of a termination of parental rights hearing had been met.

The commissioner also petitioned the court to terminate the parental rights of the respondent as to C pursuant to General Statutes (Rev. to 1999) § 17a-112 (c) (3) (F), now (j) (3) (F), which authorizes the court to do so if it finds by clear and convincing evidence that a parent "has committed an assault, through [a] deliberate, nonaccidental act that resulted in serious bodily injury of another child of the parent . . . ." The respondent's statement to the police that she deliberately slammed C's brother's head against the floor, which resulted in fractures of the skull would allow the court to conclude by clear and convincing evidence that the

respondent committed an assault on C's brother resulting in serious bodily injury.

"In the dispositional phase of a termination of parental rights hearing, the trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child. In arriving at this decision,[8] the court is mandated to consider and make written findings regarding seven factors delineated in § 17a-112 (d) [now (k)].[9] On appeal, we will

[8] The court, in its decision, applied to both children the dispositional factors that are required to be considered.

[9] General Statutes § 17a-112 (k) provides: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding: (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent; (2) whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended; (3) the terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order; (4) the feelings and emotional ties of the child with respect to the child's parents, any guardian of such child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties; (5) the age of the child; (6) the efforts the parent has made to adjust such parent's circumstances, conduct, or conditions to make it in the best interest of the child to return such child home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child; and (7) the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

We note that subdivision (k) of § 17a-112 had been designated subdivision (d) before Public Acts 2000, No. 00-137, § 1, took effect on July 1, 2000. Although the wording of the subdivision was not changed by the redesignation, subdivision (d) is applicable to C and subdivision (k) is applicable to

disturb the findings of the trial court in both the adjudication and disposition only if they are clearly erroneous." *In re Tabitha P.*, supra, 39 Conn. App. 361–62.

The court, in its comprehensive decision, made detailed findings pursuant to § 17a-112 (k). Those findings can be summarized as follows. At the time of trial, C was a little more than three years old and M was almost one year younger. They were removed from the respondent when she was arrested on September 11, 1998, in connection with the injuries M had suffered three days earlier, and the commissioner has retained custody of the children from that time. As a condition of being released from jail, the respondent was ordered to have no contact with the children, and on December 31, 1998, she informed the department of children and families (department) that she would not have any further contact with the department. The respondent has not seen her children since September, 1998. The respondent regularly inquired about the children's welfare, requested visitation and sent gifts, but never challenged the condition of her release that she have no contact with her children. The children were placed with foster parents with whom, during the subsequent two years, they resided and formed a close and loving attachment. The children have little memory of the respondent and perceive their foster parents, who want to adopt them, as their parents. There is no evidence that the respondent has been prevented from maintaining a meaningful relationship with the children by their father, any other person or by the economic circumstances of the respondent.

The court found that it would not be in the best interests of the children to reintroduce the respondent into their lives when they had not seen her in more

M because the court on November 20, 2000, granted the commissioner's motion, as to M only, to amend the coterminous petitions.

than two years, nor would it be in the children's best interests to have them remain in the uncertainty of foster care when permanency planning is the goal with respect to their lives. The court found by clear and convincing evidence that it is in the best interests of the children that the respondent's parental rights be terminated. We do not find that conclusion to be clearly erroneous.

The judgments are affirmed.

In this opinion the other judges concurred.