******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* JEFFREY YEAW
(AC 36255)

Sheldon, Keller and Harper, Js.

*Argued September 16, 2015—officially released January 12, 2016*

(Appeal from Superior Court, judicial district of New Britain, D'Addabbo, J.)

*Ilana R. N. Ofgang*, for the appellant (defendant).

*Jonathan M. Sousa*, special deputy assistant state's attorney, with whom, on the brief, was *Brian Preleski*, state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Jeffrey Yeaw, appeals from the judgment of conviction, rendered after a jury trial, of three counts of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2)[1] and 53a-59 (a) (5),[2] and three counts of attempt to commit assault of a peace officer in violation of General Statutes §§ 53a-49 (a) (2) and 53a-167c (a) (1).[3] On appeal, the defendant claims that (1) the trial court violated his due process rights when it failed to order, sua sponte, a competency evaluation; (2) the state adduced insufficient evidence to prove beyond a reasonable doubt that he had the specific intent to commit all six counts he was charged with; and (3) the court abused its discretion when it admitted into evidence testimony concerning arrest warrants against him for uncharged misconduct. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In March, 2012, the defendant resided at the home of his uncle, Richard Landry, located at 18 Peck Street in Berlin. On the evening of March 8, 2012, the defendant and Landry became involved in a verbal altercation, which eventually escalated to the point where Landry called the police. At approximately 10:30 p.m., Officers Scott Calderone and Michael Silverio of the Berlin Police Department were dispatched to Landry's house to respond to a domestic disturbance. The dispatcher informed Calderone that a man on the back porch of the house had a gun. Calderone and Silverio arrived at the house at approximately the same time and observed Landry, who was outside on the grass in between the house and a church next door. Calderone shined his spotlight on Landry and motioned for Landry to approach him. Landry approached, identified himself, and spoke with Calderone and Silverio. Shortly thereafter, Sergeant Mark Soneson arrived at the scene. All three officers were in uniform, and all three officers arrived in separate marked police vehicles.

After Landry called the police, the defendant—aware that he had outstanding warrants—decided to flee Landry's house. The defendant gathered some of his belongings, stepped out onto the front porch, and observed a police vehicle outside of the house. He then reentered the house, retrieved a firearm, turned off all of the lights in the house, and returned to the front porch.

After speaking with Landry, Calderone, Silverio, and Soneson concluded that they needed to enter the house. The officers proceeded to the rear of the house and entered through the rear door. Upon entry, they realized that all of the lights in the house were off and that the house was completely dark. Soneson announced the officers' presence to the defendant, stating, "Jeff, it's the police department. Would you come out; we have

to talk to you." When the defendant did not respond, the officers, each of whom was carrying a lighted flashlight, began to search the first floor of the house, proceeding, room by room, from the rear of the house toward the front. After inspecting several rooms at the rear of the house, they entered a narrow interior hallway that led to the front porch. The inside door between the hallway and the front porch was closed. Silverio opened the door with Soneson and Calderone behind him. Once the door was opened, Silverio saw the defendant crouched on the floor and holding a gun, which the defendant pointed directly at him. Silverio promptly yelled out, "gun," and the defendant fired several shots. Silverio quickly retreated and took cover in the home office to his left. Calderone, who saw the muzzle flash from the defendant's weapon and felt a bullet whiz by his head, ducked quickly into a room to his right and across the hall from the home office. In the meantime, Soneson, who ducked into the home office after Silverio, returned fire and struck the defendant at least twice. The defendant was severely wounded, but refused medical treatment at the scene, in the ambulance, and at the hospital. While first responders were treating the defendant at the scene, the defendant begged the officers to shoot and kill him. In the ambulance, the defendant ordered the treating paramedic to leave him alone and let him die.

The defendant was charged with three counts of attempt to commit assault in the first degree and three counts of attempt to commit assault of a peace officer. Following a jury trial, the defendant was convicted of all six counts. The defendant subsequently was sentenced to a total effective term of forty-eight years incarceration. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court abused its discretion by failing, sua sponte, to order a competency hearing. He argues that his competency was called into question on numerous occasions, and that the court's failure to address his competency violated his due process rights. The state objects, arguing that the evidence before the court did not raise a reasonable doubt about the defendant's competency, and thus the court had no reason to address the defendant's competency. We agree with the state.

The following additional facts are relevant to our disposition of this issue. On March 29, 2012—approximately three weeks after the incident at Landry's house—the defendant was interviewed by Detective Matthew Gunsalus of the state police. During this interview, the defendant stated that while he was sitting on Landry's front porch on the day of the incident, he attempted to shoot himself. He also stated that he would not have minded if the police killed him at Landry's

house, and that his intent that evening was not to surrender to the police.

At the sentencing hearing, defense counsel addressed the court regarding the defendant's mental state. Defense counsel represented to the court that the defendant "has some mental health problems," and that he believed "that there is some sort of compromise to [the defendant's] mental state." At the conclusion of defense counsel's remarks, the defendant addressed the court for forty-five minutes. During this address, the defendant accused the prosecutor of perjury, fabricating evidence, and tampering with witnesses; he accused the state and its various political subdivisions of racketeering and other conduct allegedly designed to frustrate equal protection of the law and the administration of justice; he accused Landry of nine crimes, including assault in the first degree, attempted murder, and fabricating evidence; and he asserted that the Connecticut Bar Association regulates the legal profession so as to impede access to the courts and to further its own interests. At no point during these proceedings did the court order a competency evaluation.

The defendant claims that the court, sua sponte, should have ordered a competency evaluation. Specifically, the defendant argues that (1) his expressed suicidal ideation during and immediately following the incident with the police at Landry's house; (2) his counsel's representations that he suffered from "some mental health problems"; and (3) his conduct during sentencing, which he characterizes as "bizarre and incoherent," all provided sufficient indicia of incompetency such that the court should have inquired into his ability to understand the proceedings against him. We disagree.

"We review the court's determination of the defendant's competency under the abuse of discretion standard. As this court has stated, [t]he trial judge is in a particularly advantageous position to observe a defendant's conduct during a trial and has a unique opportunity to assess a defendant's competency." (Footnote omitted; internal quotation marks omitted.) *State* v. *Edwards*, 158 Conn. App. 119, 133–34, 118 A.3d 615, cert. denied, 318 Conn. 906, 122 A.3d 634 (2015). "In determining whether the trial court [has] abused its discretion, this court must make every reasonable presumption in favor of [the correctness of] its action. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Internal quotation marks omitted.) *State* v. *Jordan*, 151 Conn. App. 1, 32–33, 92 A.3d 1032, cert. denied, 314 Conn. 909, 100 A.3d 402 (2014).

The defendant failed to raise this issue at trial and, accordingly, seeks to prevail on this unpreserved claim

pursuant to *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). "Under *Golding*, a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two *Golding* requirements involve whether the claim is reviewable, and the second two involve whether there was constitutional error requiring a new trial." (Internal quotation marks omitted.) *State* v. *Fagan*, 280 Conn. 69, 89–90, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491, 167 L. Ed. 2d 236 (2007); see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*).

The state concedes, and we agree, that the first two prongs of the *Golding* analysis are satisfied. We therefore proceed to a consideration of the third prong—whether the alleged constitutional violation exists and deprived the defendant of a fair trial. We conclude that the defendant's claim fails to satisfy the third *Golding* prong.

"A defendant shall not be tried, convicted or sentenced while the defendant is not competent. . . . [A] defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense." General Statutes § 54-56d (a). "Although all defendants are presumed to be competent . . . due process requires that a trial court conduct an adequate hearing regarding a defendant's competency, once her competency has been sufficiently called into question . . . . A trial court has an independent obligation to inquire, sua sponte, into a defendant's competency when there is sufficient evidence before the court to raise a reasonable doubt as to whether the defendant can understand the proceedings or assist in her defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Skok*, 318 Conn. 699, 722, 122 A.3d 608 (2015). "Thus, [a]s a matter of due process, the trial court is required to conduct an independent inquiry into the defendant's competence whenever he makes specific factual allegations that, if true, would constitute substantial evidence of mental impairment. . . . Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency . . . . The trial court should carefully weigh the need for a hearing

in each case, but this is not to say that a hearing should be available on demand. The decision whether to grant a hearing requires the exercise of sound judicial discretion." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, 253 Conn. 1, 21–22, 751 A.2d 298 (2000).

The defendant's first contention concerns evidence of his suicidal ideation. The defendant argues that his statements to Gunsalus that he tried to shoot himself at Landry's house and that he would not have minded if the police killed him, coupled with testimony adduced at trial that he refused medical attention and begged the police to shoot and kill him, constitutes substantial evidence of suicidal tendencies. These suicidal expressions, the defendant argues, bespeak an incompetence to stand trial. We disagree. Whatever suicidal tendencies the defendant may have had during or immediately after the incident were not sufficient to raise a reasonable doubt about his competency to be tried and sentenced many months later. It is settled that "the test for determining competence focuses . . . on whether [the defendant] has sufficient *present ability* to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him." (Emphasis in original; internal quotation marks omitted.) *State* v. *Mordasky*, 84 Conn. App. 436, 446, 853 A.2d 626 (2004). The incident at Landry's house and Gunsalus' interview both took place in March, 2012. Evidence in the defendant's trial began on July 10, 2013. Thus, the criminal proceedings against the defendant took place well over one year after all of the cited instances of suicidal ideation. Because there is no evidence in the record that the defendant was still burdened by suicidal thoughts during the proceedings, we reject this claim.

The defendant next argues that his counsel's representation that he "had mental issues" raised a reasonable doubt as to his competency. We disagree. "[C]ompetence to stand trial . . . is not defined in terms of mental illness. An accused may be suffering from a mental illness and nonetheless be able to understand the charges against him and to assist in his own defense . . . . A fortiori, a finding of mental illness is not required for a court to find a defendant incompetent to stand trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Bigelow*, 120 Conn. App. 632, 642–43, 994 A.2d 204, cert. denied, 297 Conn. 916, 996 A.2d 278 (2010). The record is devoid of any evidence that would have called into question the defendant's ability to either understand the charges against him or to assist in his defense.

We agree with the state that defense counsel's comments regarding the defendant's compromised mental state were made for purposes of sentence mitigation.

The theme of defense counsel's remarks during sentencing was that the defendant was a good family man, who lived a purpose-driven life, but who fell on hard times. These unfortunate circumstances, counsel continued, were at least partially caused by his mental health problems: "[The defendant] engaged in his life in the most—with the most purest of intent to be good at what he did and to be a good father to his children. What we do know [is] that he has some mental health problems." After explaining these circumstances, defense counsel stated: "So, I'm going to ask the court to—when you impose a sentence to take that into account and provide a measured response."[4] Thus, when defense counsel addressed the court, the purpose was to seek leniency, not to highlight the defendant's incompetency. We conclude that these statements did not raise a reasonable doubt about the defendant's competence.

Finally, the defendant argues that his conduct during sentencing constituted strong evidence of his incompetency. During sentencing, the defendant accused the prosecutor and Landry of various crimes, the state of racketeering, and the Connecticut Bar Association of corruption. The defendant argues that this behavior, which he characterizes as "bizarre and incoherent," was substantial evidence of incompetency, which the court failed to address and, thus, abused its discretion. We disagree that these comments, however out of the ordinary, underscore a compromised ability of the defendant to understand the charges and proceedings against him. To begin with, we reject the defendant's contention that the court failed to appreciate the content of his comments. On the contrary, the record reveals that the court was cognizant of the substance of the defendant's remarks, but considered them to be an indicator of defiance rather than incompetence. Immediately after the defendant spoke, defense counsel emphasized to the court that the defendant "is an intelligent man who has goodness and who, like I said earlier, wanted to live his life in a certain way." Defense counsel continued by emphasizing that, notwithstanding these attributes of intelligence and ambition, the defendant "is trapped in a bad place where he's seeking explanations to things that haven't gone right for him." The court replied with its own remarks and characterized the defendant as a person who "appears to have a significant problem with authority and authority figures." This convinces us that the court was mindful of the substance of the defendant's remarks but did not believe, after listening to him and observing his conduct and demeanor, that he was incompetent.

This court's holding in *State* v. *Williams*, 65 Conn. App. 59, 782 A.2d 149, cert. denied, 258 Conn. 923, 782 A.2d 1251 (2001), is instructive. The defendant in *Williams* claimed that statements he made concerning a perceived police conspiracy against him highlighted his incompetency to stand trial. The trial court found

that the defendant was competent, notwithstanding the opinion of a psychiatrist to the contrary. This court affirmed, holding in relevant part: "[t]he defendant's delusionary thoughts . . . such as his claim that the police put some drug in the cup of coffee he was given at the police station and his belief that the occupants of his apartment building as well as the police were conspiring against him, may well have been his way of coping with the dire situation confronting him." Id., 87. Similarly, in the present case, the trial court reasonably could have concluded that the defendant was coping with a dire situation in which he perceived himself to be a victim. The court's opinion that the defendant rejected authority was consistent with the defendant's comments, in which he meted out blame to the prosecuting authority, the state, the Connecticut Bar Association, and his uncle. In conjunction with defense counsel's assertion that the defendant was "seeking explanations to things that haven't gone right for him," the court reasonably could have understood the defendant's comments to highlight not a compromised ability to understand the proceedings, but a scornful and defiant rejection of the state's filing of charges against him.

We further disagree with the defendant's characterization of his remarks as "incoherent." Quite the contrary, certain of his statements, however ungrounded, were very well organized, logical, and articulate. The defendant accused the prosecutor and Landry, for example, of a number of crimes, citing to specific sections of the General Statutes and supporting these accusations with relevant facts. This demonstrates, in our view, a high degree of coherence, thought, and preparation, not to mention a thorough understanding of the proceedings and the underlying facts. Indeed, immediately after the defendant addressed the court, defense counsel emphasized to the court that the defendant "is an intelligent man . . . ." Defense counsel's endorsement of the defendant's intelligence, coupled with his failure to request a competency hearing, strongly suggests to us that there was no indication of an impaired competency at trial or at sentencing. See *State* v. *Monk*, 88 Conn. App. 543, 550, 869 A.2d 1281 (2005) ("[t]he fact that the defendant's counsel did not request a competency hearing is an indicator of the defendant's competency").

Ultimately, "[t]he trial judge is in a particularly advantageous position to observe a defendant's conduct during a trial and has a unique opportunity to assess a defendant's competency." (Internal quotation marks omitted.) *State* v. *Connor*, 292 Conn. 483, 523–24, 973 A.2d 627 (2009). We conclude that the court did not abuse its discretion in not ordering a competency hearing, sua sponte. Accordingly, the defendant has failed to prove that his due process rights were violated, and his claim fails to satisfy the third prong of *Golding*.

## II

The defendant claims next that the evidence submitted at trial was insufficient to support his conviction of each charge against him. The defendant was charged with three counts of attempt to commit assault in the first degree and three counts of attempt to commit assault of a peace officer, one count of each charge for each officer. He claims that the state adduced insufficient evidence for the jury to conclude that he knew that three officers were in the house when he fired his weapon. The defendant argues that because attempt to commit assault in the first degree requires proof that he had the specific intent to injure *each officer individually*, because attempt to commit assault of a peace officer requires proof that he had the specific intent to prevent *each officer* from performing his duties, and because there was insufficient evidence adduced to establish that he knew Calderone and Soneson were in Landry's house, the defendant's conviction should be vacated in part. We disagree.

The following additional facts are pertinent to our disposition of this issue. Calderone and Silverio arrived at Landry's house at approximately the same time, and Soneson arrived a few minutes later. The officers did not enter the house immediately, but spoke with Landry outside. Calderone illuminated the area with the spotlight affixed to his vehicle while the officers spoke with Landry in front of the house. Additionally, two other officers—Michael Manning and Brian Falco—arrived at the scene before Calderone, Silverio, and Soneson entered the house.[5]

After Landry called the police, the defendant attempted to flee. Gunsalus testified that during his interview with the defendant, the defendant stated that when he proceeded to the front porch of the house to flee, he "observed that there was a police vehicle out in front of the residence." Once the officers entered the house, they realized that all of the lights in the house were off and that the house was completely dark. They decided not to turn the lights back on because they did not wish to be backlighted, which could have jeopardized their safety. Instead, they decided to illuminate the house using their flashlights, which both eliminated the danger of being backlighted and afforded the tactical advantage of being able to temporarily blind a target by shining light in his or her eyes. Once Silverio opened the door to the front porch and yelled, "gun," the defendant opened fire. When asked how many shots were fired by the defendant, Soneson testified that "I can definitely say he fired four shots. I was reasonably certain he fired five . . . ."

"In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict.

Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Allan*, 311 Conn. 1, 25, 83 A.3d 326 (2014). "[I]n [our] process of review, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 147, 869 A.2d 192 (2005).

The defendant claims that the state failed to present sufficient evidence that he knew that all three officers were in the house and, therefore, that he intended to fire upon all three officers. Specifically, the defendant argues that insufficient evidence was adduced to prove that he knew that Calderone and Soneson were in the house. In support of this position, the defendant relies on testimony that Soneson and Calderone were positioned behind Silverio, with Soneson standing approximately five feet behind Silverio and Calderone positioned in between the other two and to their right. The defendant also relies on evidence in the record that the hallway in which the officers were standing was very narrow, that the house was completely dark, and that the officers were using their flashlights with the intention to blind him. The defendant claims that the state presented no evidence that he was aware that Calderone or Soneson were behind Silverio in this dark and narrow hallway, and, therefore, that the state did not prove beyond a reasonable doubt his specific intent to attempt to commit the substantive crimes against each of them. We disagree.

It is settled that attempt is a specific intent crime. "[A] person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime. Proof of an attempt to commit a specific offense requires proof that the actor intended to bring about the elements of the completed offense. . . . Moreover, to be guilty of attempt, a defendant's conscious objective must be to cause the result which would constitute the substantive crime." (Citation omitted; internal quotation marks omitted.) *State* v. *Sorabella*, 277 Conn. 155, 169–70, 891 A.2d 897, cert. denied, 549 U.S. 821, 127 S. Ct. 131, 166 L. Ed. 2d 36 (2006). "Intent is a question of fact, the determination of which should stand unless the conclusion drawn by the trier is an unreasonable one. . . . [T]he [jury is] not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading up to and immediately following the incident. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Citations omitted; internal quotation marks omitted.) *State* v. *Andrews*, 114 Conn. App. 738, 744–45, 971 A.2d 63, cert. denied, 293 Conn. 901, 975 A.2d 1277 (2009). With respect to the substantive offenses in the present case, "[a]ssault in the first degree is a specific intent crime. It requires that the criminal actor possess the specific intent to cause serious physical injury to another person." (Internal quotation marks omitted.) *State* v. *Sivak*, 84 Conn. App. 105, 110, 852 A.2d 812, cert. denied, 271 Conn. 916, 859 A.2d 573 (2004). "The requisite intent for assault of a peace officer is the intent to prevent the peace officer from performing his duties rather than the intent to cause the resulting injury." *State* v. *Jones*, 96 Conn. App. 634, 639, 902 A.2d 17, cert. denied, 280 Conn. 919, 908 A.2d 544 (2006).

We conclude that there was sufficient evidence for the jury to conclude that the defendant had the specific intent to both injure all three officers and to prevent them from performing their duties. To begin with, we are mindful of the principle that "[t]he defendant's state of mind at the time of the shooting may be proven by

his conduct before, during and after the shooting. Such conduct yields facts and inferences that demonstrate a pattern of behavior and attitude toward the victim by the defendant that is probative of the defendant's mental state." (Internal quotation marks omitted.) *State* v. *Bennett*, 307 Conn. 758, 766, 59 A.3d 221 (2013). With respect to the defendant's conduct before the shooting, our review of the record shows that the defendant had numerous opportunities to observe several officers outside of the house. The defendant told Gunsalus that he proceeded onto the front porch in an attempt to flee, where he "observed that there was a police vehicle out in front of the residence." The defendant's statement that "there was *a* police vehicle," suggests that he only saw one vehicle. (Emphasis added.) Calderone and Silverio both testified, however, that they arrived at approximately the same time as each other: Calderone's exact words were that "[Silverio] was ahead of me and I was *directly behind him*." (Emphasis added.) There was also testimony that Soneson arrived "within a few minutes upon" Calderone's arrival. Calderone testified that he activated his spotlight in front of the house when the officers engaged Landry, demonstrating to the jury that the area where the officers who responded congregated was well lit and visible. The jury could have inferred that the defendant had an opportunity from his position on the front porch to observe several police officers and identify them as such, because the three officers who entered testified that they were in uniform and arrived in separate marked police cars. Because the house is not very large,[6] because Calderone testified that the officers did not enter until after they spoke with Landry, and because the area where the police congregated was well lit and visible from the front porch, the jury reasonably could have concluded that by the time the defendant had returned to the front porch after arming himself, he had the opportunity to observe and identify more than one police officer congregating outside of the house.

After speaking with Landry, Calderone, Silverio, and Soneson entered the house through the rear entrance. Once inside, Soneson announced, "it's the police department. Would you come out; we have to talk to you." The jury could have inferred that Soneson's announcement that "*we* have to talk to you" conveyed to the defendant that more than one officer was in the house. (Emphasis added.) The officers testified that they illuminated the dark house with flashlights, and each officer had his own individual light. They also testified that they used flashlights for a tactical advantage; if the defendant appeared, they would be able to blind him. There is *no evidence*, however, that the defendant was in fact blinded when he encountered the police. None of the officers testified that they were able to blind the defendant, and the defendant did not testify.

The evidence also supports the jury's determination

that the defendant identified each officer inside the house when he opened fire. Immediately after he opened the door, Silverio yelled out, "gun." The jury could have inferred that the defendant understood this to be a communication to other officers in the house. The quantity of shots fired also supports the jury's verdict. Soneson testified that he was certain that the defendant fired at least four shots, and that he was reasonably certain the defendant fired five. The jury reasonably could have concluded that the defendant identified three officers and fired enough shots to harm and/or impede each of them.

The defendant stresses that the officers' positioning in the narrow hallway made it doubtful that he could see each of the officers. In particular, the defendant relies on Soneson's testimony that he was five or six feet behind Silverio and that he did not have a clear view of the defendant. The defendant argues that because Soneson did not have a clear view of the defendant, it is likely that the defendant did not have a clear view of Soneson, and therefore did not know he was there. However likely or unlikely the defendant was to have viewed Soneson in the house was a determination for the jury to make, which we do not lightly disturb. On appeal, this court is "limited to determining whether the inferences drawn by the jury are *so unreasonable as to be unjustifiable.* . . . [T]he inquiry into whether the record evidence would support a finding of guilt beyond a reasonable doubt does not require a court to ask itself whether it believes that the evidence . . . established guilt beyond a reasonable doubt. . . . Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.*" (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Morgan*, 274 Conn. 790, 801, 877 A.2d 739 (2005). The evidence shows that the defendant was in close proximity to the officers: each officer testified that the defendant was in a crouched position in front of the door leading to the front porch. Each officer carried his own flashlight, which the jury could have inferred made all three of them individually visible to the defendant in the dark house. And there is evidence that the defendant fired at least four and possibly five shots, more than enough to harm or impede three individuals. With respect to the officers individually, the defendant clearly saw Silverio: he fired at him immediately after the door was opened. Additionally, the bullet from the defendant's first shot whizzed by Calderone's head before he had an opportunity to take cover. The jury could have inferred that the defendant was aiming for Calderone on the basis of this trajectory. And once Soneson returned fire, he, or at least his gun, would have been visible to the defendant as well. On the basis of this

evidence, we cannot say that *no* rational juror could reach the conclusion that the jury in the present case did.

In sum, there was sufficient evidence from which the jury could have concluded that the defendant (1) observed more than one officer congregating outside of the house, (2) saw three officers at various points once the door was opened, or at the very least, three separate flashlights, and (3) fired enough shots to harm each of the officers. The cumulative impact of these facts supports the jury's determination that the defendant had the requisite intent to commit all six crimes of which he was convicted. See *State* v. *Padua*, supra, 273 Conn. 146–47. Accordingly, we affirm the defendant's conviction on each count.

## III

The defendant next claims that the court improperly admitted, over his objection, evidence of warrants against him. The defendant argues that this evidence was unduly prejudicial because the warrants pertained to remote instances of uncharged misconduct. We disagree.

The following additional facts are relevant to this claim. On July 11, 2013, the second day of trial, the state notified the court that it intended to call Gunsalus as a witness. The defendant responded with an oral motion in limine, seeking to preclude Gunsalus from testifying about certain statements the defendant made during their interview in March, 2012. Specifically, the defendant argued that the state intended to elicit testimony from Gunsalus that the defendant stated that he was aware of outstanding arrest warrants against him. The defendant argued that these statements were unduly prejudicial and irrelevant because the warrants were old and pertained to instances of uncharged misconduct.

The court heard Gunsalus' proposed testimony outside of the jury's presence. The following testimony was elicited:

"[The Prosecutor]: And I know that you talked to [the defendant] about the evening in question here and in connection with that when you talked to [the defendant], did you talk to [the defendant] about a point in time where he made a decision to gather up some of his personal effects and leave the home on Peck Street in Berlin?

"[Gunsalus]: Yes, sir.

"[The Prosecutor]: And what did [the defendant] tell you about that?

"[Gunsalus]: He had reported that he was aware that Mr. Landry had contacted 9-1-1; that he was on the rear porch of the residence; and that he was going to gather some items to leave the residence. During that time

or following that, he went to that front porch and he observed a police vehicle at the front of the residence on the street at which time he went back inside to the residence or the main portion of the residence and retrieved a firearm.

"[The Prosecutor]: And did [the defendant] describe to you his knowledge of any legal problems that he had?

"[Gunsalus]: He did.

"[The Prosecutor]: What did he tell you?

"[Gunsalus]: He had reported that he was aware of the fact that there were outstanding arrest warrants for him."

The defendant objected to this testimony on the grounds that the warrants in question were remote and related to uncharged misconduct. The state argued that Gunsalus' testimony should be admissible on the ground that the defendant's statement constituted an admission relevant to his motive. The court agreed with the state and denied the defendant's motion in limine on that ground, reasoning that "the knowledge that there existed arrest warrants for the defendant [was on] his mind. . . . The court believes that that goes to state of mind at the time of the police entry and it also goes to motive." Subsequently, the state elicited this testimony from Gunsalus before the jury.

On July 16, 2013, during its instructions to the jury, the court gave the following limiting instruction: "[T]here was testimony presented by [Gunsalus] that [the defendant] indicated to him that [the defendant] was aware that there were outstanding warrants for him. That information that the defendant was aware that there were outstanding warrants for him was admitted solely to show or establish the defendant's intent and/or motive.

"That information is not admitted to prove the bad character of the defendant or the defendant's tendency to commit criminal acts. You may not consider such evidence as establishing a predisposition on the part of the defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may consider such evidence if you believe it and further find that it logically, rationally and conclusively supports the issue for which it is being offered by the state, but only as it may bear on the issue of the defendant's intent and/ or motive.

"On the other hand, if you do not believe such evidence, or even if you do, if you find that it does not logically, rationally, and conclusively support the issue for which it is being offered by the state, the defendant's intent and/or motive, then you may not consider that testimony for any other purpose."

"The principles guiding our review of a trial court's decision to admit prior uncharged misconduct evidence

are well settled. Evidence of a defendant's uncharged misconduct is inadmissible to prove that the defendant committed the charged crime or to show the predisposition of the defendant to commit the charged crime. . . . Exceptions to this rule have been recognized, however, to render misconduct evidence admissible if, for example, the evidence is offered to prove intent, identity, malice, motive, a system of criminal activity or the elements of a crime. . . . To determine whether evidence of prior misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the other crime evidence. . . . Since the admission of uncharged misconduct evidence is a decision within the discretion of the trial court, we will draw every reasonable presumption in favor of the trial court's ruling. . . . We will reverse a trial court's decision only when it has abused its discretion or an injustice has occurred." (Citations omitted; internal quotation marks omitted.) *State* v. *Milan*, 290 Conn. 816, 830–31, 966 A.2d 699 (2009).

Applying these principles to the present case, we conclude that the court did not abuse its discretion when it admitted Gunsalus' testimony. With respect to the first prong—whether Gunsalus' testimony related to one of the exceptions to the general rule precluding evidence of prior uncharged misconduct—we agree with the state that this testimony was relevant to the defendant's motive. The evidence showed that the defendant was motivated by a desire to escape apprehension by the police. By the defendant's own admission, his knowledge of outstanding warrants against him drove him to flee after Landry notified the authorities. Gunsalus testified at trial that the defendant stated "that during the course of the police officers' searching the residence, his intent was not to surrender." Because the defendant's concerns about outstanding warrants illuminate a motive to escape, and because the jury reasonably could find that this motive to escape galvanized the defendant to fire upon the officers, we conclude that the court's determination that this evidence was relevant was not an abuse of discretion.

We also agree that the probative value of Gunsalus' testimony outweighed the prejudicial effect. "The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury." (Internal quotation marks omitted.) *State* v. *Franko*, 142 Conn. App. 451, 465, 64 A.3d 807, cert. denied, 310 Conn. 901, 75 A.3d 30 (2013). The court took appropriate measures to ensure the jury's emotions would not be improperly aroused. The evidence was admitted for the limited purpose of its relevance

to the defendant's motive or intent and the substance of the warrants was not admitted into evidence. Additionally, the court gave precise and detailed limiting instructions to the jury. "It is axiomatic that a jury is presumed to have followed a court's limiting instructions. . . . [I]nstructions limiting the use of the misconduct evidence [serve] to minimize any prejudicial effect that it otherwise may have . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Kantorowski*, 144 Conn. App. 477, 492, 72 A.3d 1228, cert. denied, 310 Conn. 924, 77 A.3d 141 (2013). Accordingly, we conclude that the court acted within its discretion to admit testimony concerning the defendant's outstanding warrants.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-49 (a) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[2] General Statutes § 53a-59 (a) provides: "A person is guilty of assault in the first degree when . . . (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[3] General Statutes § 53a-167c (a) provides in relevant part: "A person is guilty of assault of public safety . . . personnel when, with intent to prevent a reasonably identifiable peace officer . . . from performing his or her duties, and while such peace officer . . . is acting in the performance of his or her duties, (1) such person causes physical injury to such peace officer . . . ."

Although § 53a-167c was recently amended by our legislature; see Public Acts 2015, No. 15-211, § 15; those amendments have no effect on our resolution of this appeal.

[4] Defense counsel repeated this sentiment after the defendant spoke: "[T]here is some sort of compromise to [the defendant's] mental state. I hope that we're able to connect with him to address these issues. This is not where he wants to end up. He wanted to be like the rest of us are, at a home, raising kids and doing what we love to do for a living. So with that, I would ask the court to take that into account. I would ask the court to understand or to put into perspective . . . that he's trapped, it seems to me, he is trapped in a bad place where he's seeking explanations to things that haven't gone right for him."

[5] Neither Manning nor Falco entered the house, and neither testified at trial.

[6] The jury was shown photographs of the interior and exterior of the house.